USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __8/11/2017__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MELINA BERNARDINO,

                        Plaintiff,

-against-

BARNES & NOBLE BOOKSELLERS, INC.,

                        Defendant.

-------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

**17-CV-04570 (LAK) (KHP)**

**TO: THE HONORABLE LEWIS A. KAPLAN, United States District Judge**
**FROM: KATHARINE H. PARKER, United States Magistrate Judge**

      Plaintiff Melina Bernardino brings this action on her own behalf and on behalf of a putative class against Defendant Barnes & Noble Booksellers, Inc. ("Barnes & Noble") pursuant to the federal Video Privacy Protection Act (the "VPPA"), 18 U.S.C. § 2710, the New York Video Consumer Privacy Act ("NY VCPA"), N.Y. Gen. Bus. L. §§ 670-675, and the New York Consumer Protection Statute ("NY CPA"), N.Y. Gen. Bus. L. § 349.  She asserts that Barnes & Noble disclosed personally-identifiable consumer video records to Facebook without her consent in violation of the VPPA, the NY VCPA, and the NY CPA.  (Doc. No. 1 ("Compl.") ¶¶ 91-130.)

      Presently before this Court for Report and Recommendation is Bernardino's motion for a preliminary injunction, brought pursuant to the VPPA.  18 U.S.C. § 2710(c)(2)(D) (private plaintiff may obtain "preliminary and equitable relief as the court determines to be appropriate").  This Court heard extensive oral argument on the motion on August 2, 2017 and considered declarations and other evidence and case law submitted by the parties.  Both parties agreed at the oral argument that a further evidentiary hearing was not needed.  Having fully considered the arguments on both sides and for the reasons set forth below, this Court

1

respectfully recommends that the motion for a preliminary injunction be DENIED.

**BACKGROUND**

The facts of this case are relatively simple.  On February 3, 2017, Bernardino purchased a DVD online from Barnes & Noble.  (Compl. ¶ 7.)  Bernardino made the purchase on her Apple iPhone and checked-out as a "guest" to complete her purchase.  (Compl. ¶¶ 7, 21, 53; *see also* Doc. No. 24 ("Bernardino Decl.") ¶ 3.)  Bernardino, who is a Facebook user, was logged into her Facebook account at the time she made the purchase.  (Bernardino Decl. ¶ 8.)  Bernardino used Safari as a browser when purchasing the DVD.  (Bernardino Decl. ¶ 4.)

Sometime after her purchase, Bernardino learned that Barnes & Noble's website/computer system had conveyed the name of the DVD she purchased, the DVD's product ID and purchase price, her IP address, a Facebook "fr" cookie, and certain information about her phone ("DVD purchase information"), to Facebook's database.  (Compl. ¶¶ 7, 54.) The record is silent as to the precise date when Bernardino learned of this alleged disclosure. During oral argument, Bernardino's counsel explained that, through privileged conversations, Bernardino learned her DVD purchase information had been shared with Facebook before filing the Complaint on June 16, 2017.  Bernardino did not learn that her DVD purchase information had been shared on her own.  Rather, Bernardino retained an expert, James Sherwood, through her counsel, and that expert then purchased the same DVD she did from Barnes & Noble's website through an iPhone, analyzed 800 pages of computer code generated in connection with that purchase with the aid of a special software program called "Web Inspector," which

revealed that his purchase was transmitted to Facebook.[1]  (Doc. No. 23 ("Sherwood Decl.") ¶¶ 2, 13-14, 20-21.) According to Plaintiff's expert, with transmission of this information, Facebook's system could link the purchase to Bernardino's unique Facebook ID number.  (Doc. No. 21 ("Pl.'s Mem. of L.") pp. 2-3; Sherwood Decl. ¶¶ 20-26; Doc. No. 38 ("Pl.'s Reply Br.") p. 4; Doc. No. 45.)  Bernardino states that she did not consent to her DVD purchase information being conveyed to Facebook.  (Compl. ¶¶ 7, 54.)

On June 30, 2017, shortly after filing the Complaint, Bernardino brought the instant motion seeking to enjoin Barnes & Noble from providing DVD purchase information to Facebook without its customers' consent.  (Doc. Nos. 20, 20-1.)  This relief would require Barnes & Noble to alter its website and coding to prevent Facebook from transmitting the "fr" cookie, as well as preclude the collection and conveyance of purchase information through it, absent a shopper's express agreement manifested by clicking on a separate consent button.[2] (Doc. Nos. 20, 20-1.)

Bernardino does not know whether any actual person at Facebook ever learned the name of the DVD she purchased.  (*See* Doc. No. 45 at 8:4-9:8.)  She contends, however, that

---

[1] According to Bernardino's expert, the data is transmitted to Facebook regardless of whether the purchaser is simultaneously logged into his or her Facebook account, so long as the purchaser has a Facebook account. (Sherwood Decl. ¶ 30 & Ex. G.)  There is no contemporaneous proof of Bernardino's DVD purchase information being shared with Facebook; rather, she posits that the same process that occurred with her expert occurred with respect to her purchase.

[2] According to Sherwood, in order to place a Facebook button on its website, Barnes & Noble had to integrate code from a Facebook Software Development Kit ("SDK"), which causes the transmissions.  If the Barnes & Noble customer is a Facebook user, the code sends a signal to Facebook, which in turn sends a pixel to the Barnes & Noble website that is associated with the user's Facebook ID number.  Through the pixel, "Facebook requests that the purchase parameters be fetched and sent to Facebook."  Facebook can then link the purchase information with the customer's Facebook ID number.  The pixel stores the information in Facebook's "fr" cookie.  Barnes & Noble's website also contains a pixel called a "fbpixel."  The fbpixel captures a customer's browser activity to send ads to the customer's Facebook page or another party's web page based on browser activity.  (Sherwood Decl. ¶¶ 20-26.)

Facebook as an entity is a "person" for purposes of the VPPA and now has personally identifiable information that she did not wish for it to have, *i.e.*, the DVD purchase information. (Pl. Mem. of L. pp. 9-11.)  Barnes & Noble disputes that the information conveyed is "personally identifiable information" as contemplated by the VPPA and that to the extent Bernardino's DVD purchase information was conveyed to Facebook, it was not a "knowing" conveyance within the meaning of the VPPA because it did not know that Facebook would combine the information with Bernardino's unique Facebook ID to deduce that Bernardino purchased a particular DVD. (Doc. No. 34 ("Def.'s Opp.") pp. 16-23.)

Bernardino states that she values her privacy and her ability to control which personal information she shares and which information she keeps private.  (Pl.'s Mem. of L. p. 4; Bernardino Decl. ¶ 15.)  She anticipates purchasing DVDs of movies again in the future for herself and her new baby daughter.  (Bernardino Decl. ¶ 12.)  Because she is a new mother, she anticipates that online shopping will provide important conveniences versus shopping at physical stores.  (Bernardino Decl. ¶ 12.)  Bernardino represents that she would also like to consider shopping on Barnes & Noble's website again in the future when evaluating purchase options, but only "if it complies with data privacy laws such as the VPPA."  (Bernardino Decl.¶ 13.)  In other words, she states that she will not make purchases through Barnes & Noble's website until it provides her with a means to "opt-out" or prohibit the transmission of her DVD purchase information to Facebook.  (Pl.'s Mem. of L. p. 4.)

At oral argument, Bernardino's  counsel conceded that by virtue of choosing to have a Facebook account, Facebook knows many intimate details about Bernardino including her birthdate, names of friends and family, likes and dislikes to posts, contact information, and

myriad other information that Facebook users routinely share with Facebook and their friends or the public through their social media activity.  (*See* Doc. No. 45.)  While Bernardino states that she values her privacy, she has chosen to participate in social media and will continue to have a Facebook account because it would be "socially awkward" to stop using Facebook. (Bernardino Decl. ¶ 14.)

There also is no dispute that Bernardino has many options for purchasing DVDs, including through Amazon, other online vendors, and brick and mortar stores.

Both Barnes & Noble and Facebook have policies posted online that are relevant to this matter.  The relevant Barnes & Noble policies are its Terms of Use and Privacy Policies.  The Terms of Use Policy states that any claim that arises out of the Barnes & Noble site must be resolved through binding arbitration.  (Def.'s Opp. p. 2; *see also* Doc. No. 41.)  Pursuant to this policy, Barnes & Noble filed a Motion to Compel Arbitration on August 2, 2017.  (Doc. Nos. 39-41.)

Barnes & Noble's Privacy Policy states, "By interacting with Barnes & Noble in the manner described in this Privacy Policy at any time, you are accepting the practices described in this Privacy Policy and you consent to the application of this Privacy Policy to the collection, storage, use and disclosure of all your personal and other information as described."  (Doc. No. 22 ("Strait Decl.") Ex. A; *see also* https://www.barnesandnoble.com/h/help/privacy-policy-complete.)

The Privacy Policy further explicitly states:

When you visit a Barnes & Noble Website, our web servers may automatically log information that your browser sends us. For example, we may receive and collect: the name of the domain and host from which you access the Internet; the Internet Protocol (IP) address of the computer you are using; the date and time you access

the Barnes & Noble Website; and the Internet address of the website from which you linked directly to the Barnes & Noble Website. We may also collect information regarding search queries run on the Barnes & Noble Website. We use this information to monitor the usage of the Barnes & Noble Websites and as necessary for our business.

(Strait Decl. Ex. A.)  It goes on to advise users that "we and/or our third party providers use cookies to recognize you," (Strait Decl. Ex. A), such as the "fr" cookie at issue here.  It states that anyone who purchases items on the website must consent to use of cookies, otherwise they cannot purchase online.  (Strait Decl. Ex. A.)  Finally, the Policy explains that Barnes & Noble shares user's personal information with its service providers, subcontractors and agents who perform services for it, including Adobe Analytics, Google Analytics, and Localytics, to third-party providers that provide products and services purchased through Barnes & Noble, to credit card companies, and to other digital content providers.  (*See* Strait Decl. Ex. A.)

There is no dispute that Barnes & Noble, like many other online shopping sites, integrates Facebook code into its website so that Facebook users can log on through Facebook or share "likes" with their Facebook friends.  (Compl. ¶¶ 2, 24; Strait Decl. Ex. A.)  Facebook's Platform Policy states that entities that incorporate Facebook links should disclose to users that Facebook may use cookies to collect and receive information from their website and to provide opt-out information to users, which Barnes & Noble does.  (Strait Decl. Exs. A-B.)  Facebook's policy requires that retail partners "comply with the VPPA and obtain any opt-in consent necessary to share data on Facebook."  (Strait Decl. Ex. B.)  Facebook's Data Policy publicly discloses that it receives personal information from any person who visits partner websites like Barnes & Noble whether the person affirmatively clicks on any social media button.  (Compl. ¶ 68; Strait Decl. Ex. C.)

Bernardino does not state whether she reviewed Facebook's policies when electing to become a Facebook member and shop online with partner websites like Barnes & Noble. Nor does she state whether she reviewed Barnes & Noble's Privacy Policy. Bernardino contends, however, that other retailers take steps not to disclose video media-identifying information, and that Barnes & Noble should do this too. (Compl. ¶¶ 44-47.) The injunction she seeks would require Barnes & Noble to modify its website to effectuate a similar change, which Bernardino contends is required by the VPPA. (*See* Doc. No. 20.)

## LEGAL STANDARDS

I. **The VPPA**

The VPPA prohibits renters and sellers of video tapes from disclosing "personally identifiable information" (often abbreviated "PII") about consumers without first obtaining the "informed, written consent . . . of the consumer that (i) is in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," and (ii) is either given at the time of disclosure or given in advance for a set period of time "not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(1)-(2)(B). The statute permits the consent to be obtained "through an electronic means using the Internet." 18 U.S.C. § 2710(b)(2)(B).

The VPPA provides for various forms of relief including monetary relief, statutory damages of up to $2,500 per breach, attorneys' fees, and preliminary injunctive relief. 18 U.S.C. § 2710(c)(2).

## II.    Preliminary Injunction

A preliminary injunction is an "extraordinary remedy" that is never awarded "as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 65 (2d Cir. 2007). The language of the VPPA permits preliminary relief in appropriate cases. 18 U.S.C. § 2710(c)(2)(D). In order to obtain a preliminary injunction, Bernardino must prove that she is likely to: (1) succeed on the merits of her claim; (2) suffer irreparable harm if an injunction does not issue; (3) that the balance of equities tips in her favor; and (4) that an injunction is also in the public's interest. *Winter*, 555 U.S. at 20; *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010). Where, as here, a plaintiff seeks an injunction that would require the defendant to take affirmative steps rather than simply preserve the status quo, there must be a clear and substantial showing of success on the merits and a strong showing of irreparable harm. *Jordan v. Metro. Life Ins. Co.*, 280 F. Supp. 2d 104, 108 (S.D.N.Y. 2003); Perrigo *Co. PLC v. Mylan N.V.*, No. 15-cv-7341 (NRB), 2015 WL 9916726, at *2 (S.D.N.Y. Oct. 29, 2015).

Bernardino also must, as a threshold matter, demonstrate standing to seek injunctive relief. *City of L.A. v. Lyons*, 461 U.S. 95, 101 (1983). Under Article III of the U.S. Constitution, a plaintiff's standing to seek injunctive relief "depend[s] on whether [s]he [i]s likely to suffer future injury." *Id.* at 105. This is true whether the plaintiff brings the case individually or on behalf of a class. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016).

## DISCUSSION

Barnes & Noble argues that Bernardino lacks standing to seek injunctive relief because she cannot demonstrate future harm. (Def.'s Opp. pp. 4-6.) It also argues that she has not

made: (i) a strong showing of irreparable harm, (ii) a clear and substantial showing of likelihood of success on the merits, or (iii) a showing that the balance of equities tips in her favor.  (Def.'s Opp. pp. 8-25.)  Finally, it argues that because this action is subject to binding arbitration, the only type of injunction available is an injunction in aid of arbitration to preserve the status quo pending arbitration.  (Def.'s Opp. pp. 6-8.)  For all these reasons Barnes & Noble urges this Court to recommend denial of Bernardino's motion for a preliminary injunction.

Bernardino argues that she has standing and can prove irreparable harm because a statutory violation in and of itself is sufficient justification for preliminary injunctive relief.  (Pl.'s Mem. of L. pp. 14-17; Pl.'s Reply Br. pp. 2-4.)  In making this argument, Bernardino argues that the statutory violation is clear and that her likelihood of success on the merits is a certainty.  (Pl.'s Mem. of L. pp. 7-17; Pl.'s Reply Br. pp. 4-7.)  She further argues that the agreement to arbitrate contained within Barnes & Noble's Terms of Use is unenforceable, such that mandatory injunctive relief is available.  (Pl.'s Reply Br. pp. 8-9.)  The Court addresses each of these issues below.

## I.    Standing

Whether Bernardino can demonstrate harm goes to her standing to seek preliminary injunctive relief and her ability to prove such relief is warranted under the irreparable harm prong of the test for issuance of a preliminary injunction.  It is well established that a plaintiff must show a likelihood of future injury to have standing to seek prospective relief—a past injury is insufficient to confer standing for injunctive relief.  *Lyons*, 461 U.S. at 111; *see also Nicosia,* 834 F.3d at 239; *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-cv-4697 (CM), 2016 WL 6459832, at *5 (S.D.N.Y. Oct. 26, 2016) (plaintiff lacked standing because he informed court he

intended to avoid harm by not purchasing the offending product absent a change in its packaging).

The Second Circuit's decision in *Nicosia* is instructive on this point. In *Nicosia,* the court held that plaintiff lacked standing to enjoin the sale of weight-loss products containing a controlled substance on Amazon's website because Amazon had stopped selling the specific product he purchased and, even though Amazon sold other products containing the controlled substance, plaintiff did not allege that he intended to use Amazon in the future to buy any products, much less weight loss products. 834 F.3d at 239. Therefore, the court in *Nicosia* concluded that plaintiff had failed to establish that he was "likely to be subjected to further sales by Amazon of products containing sibutramine," the controlled substance in the products. *Id.*

Bernardino argues that the facts in this case differ from those in *Nicosia* because she contends that Barnes & Noble continues to sell DVDs and disclose personally identifiable information in connection with such sales, citing *Kurtz v. Kimberly-Clark Corp.*, No. 14-cv-1142 (JBW), 2017 WL 1155398, at *9-10, 48-49 (E.D.N.Y. Mar. 27, 2017). (Pl.'s Reply Br. pp. 2-3.) Bernardino's argument is unpersuasive. *Kurtz* involved a class certification motion, which the court granted. *Kurtz*, 2017 WL 1155398, at *54. In so granting, the court analyzed whether the named plaintiff had standing to seek future permanent injunctive relief on behalf of himself and the class. *Id.* at *48-50. The court held that he did, and found *Nicosia* was not applicable to "cases where a defendant continues to manufacture or sell the challenged product as misleadingly labeled" for purposes of determining whether a plaintiff has standing. *Id.* at *48-50. But, this interpretation of *Nicosia* ignores the critical fact that, in *Nicosia,* Amazon

continued to sell other weight loss products that still contained the allegedly dangerous ingredient and it was the sale of those products that the plaintiff sought to enjoin.  834 F.3d at 239.  Despite the fact that Amazon was still selling the weight-loss products, the court in *Nicosia* held that plaintiff failed to establish future harm because he did not allege that he would make *any* purchases from Amazon in the future.  *Id.*  Thus, this Court disagrees with *Kurtz's* interpretation of *Nicosia*.

Prior to *Nicosia*, a handful of other courts in this District held that plaintiffs asserting violations of consumer protection statutes had standing to seek injunctive relief where the allegedly misleading conduct was still ongoing.  *See, e.g., Belfiore v. Proctor & Gamble Co.*, 94 F. Supp. 3d 440, 445 (E.D.N.Y. 2015); *Delgado v. Ocwen Loan Serving, LLC,* No. 13-cv-4427 (NGG) (RML), 2014 WL 4773991, at *14 (E.D.N.Y. Sept. 14, 2014).  For example, in *Belfiore*, the court reasoned that public policy "supports the rule that Article III standing exists to seek injunctive relief" because "[t]o hold otherwise would denigrate the New York consumer protection statute."  94 F. Supp. 3d at 445.  *Nicosia,* however, is controlling now.

While there may be legitimate policy reasons to relax the standing requirements for a preliminary injunction in the consumer protection context, *Lyons* and *Nicosia* nevertheless dictate that Plaintiff here does not have standing to seek injunctive relief.  *See Kommer v. Bayer Consumer Health*, No. 16-cv-1560 (DAB), 2017 WL 2231162, at *4 (S.D.N.Y. May 18, 2017) (appeal pending); *Chang v. Fage USA Dairy Indus., Inc.*, No. 14-cv-3826 (MKB), 2016 WL 5415678, at *5 (E.D.N.Y. Sept. 28, 2016); *see also In re Avon Anti-Aging Skincare Creams & Prods. Mktg. & Sales Practices Litig.*, No. 13-cv-150 (JPO), 2015 WL 5730022, at *8 (S.D.N.Y. Sept. 30, 2015) ("[s]ome district courts, primarily in California, have allowed such claims to go

forward because the contrary rule would preclude injunctive relief in false advertising cases . . . . Article III does not permit this sort of public policy exception"). Similar to the plaintiff in *Nicosia*, Bernardino has not alleged that she will be harmed in the immediate future. Instead, Bernardino stated in her sworn Declaration that she will not make further DVD purchases from Barnes & Noble online until it changes its website. (Bernardino Decl. ¶ 13.) This admission deprives Bernardino of standing because she has stated she intends to avoid future harm and concedes that her own conduct can prevent future harm.

Bernardino's argument that injunctive relief would be rendered unavailable in all VPPA cases by finding that she lacks standing rings hollow. There are many circumstances when preliminary injunctive relief might be appropriate; namely those situations where harm to the plaintiff is ongoing, cannot be avoided by plaintiff's own actions, and future harm is likely. This, however, is not such a case. The fact that the VPPA provides for preliminary relief in appropriate circumstances does not trump the standing requirements of the U.S. Constitution. *See Nicosia*, 834 F.3d at 239 (finding no standing under *Lyons* in suit under Consumer Product Safety Act, which permits injunctive relief at 15 U.S.C. § 2073(a)); *Kommer*, 2017 WL 2231162, at *4 (finding no standing under *Lyons* and *Nicosia* in suit under N.Y. Gen. Bus. L. § 349, which permits injunctive relief at § 349(h)); *Izquierdo*, 2016 WL 6459832, at *5 (same). Accordingly, this Court recommends that preliminary injunctive relief be denied for lack of standing.

## II. Elements of Preliminary Injunctive Relief

### A. *Irreparable Harm*

Because Bernardino cannot demonstrate future harm, *a fortiori* she cannot demonstrate irreparable harm. *Lyons*, 461 U.S. at 111 ("[An injunction] is unavailable absent a showing of

irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again."). Irreparable harm does not exist where "alternatives"—such as "purchasing . . . from another source"—are available to a plaintiff to avoid the alleged harm"—even if "these alternatives are less convenient." *Molloy v. Metro. Transp. Auth.*, 94 F.3d 808, 813 (2d Cir. 1996); *see also New Pac. Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*, No. 99-cv-2436 (DLC), 1999 WL 285493, at *8 (S.D.N.Y. May 6, 1999) (plaintiff cannot establish irreparable harm when the harm could have been avoided if plaintiff went to a different source). Here, there is no dispute that Bernardino has numerous ways to purchase DVDs—from other retailers or from Barnes & Noble stores near her home. She does not need to purchase DVDs from Barnes & Noble online, and indeed has stated that she won't make such online purchases unless Barnes & Noble changes its website.

Additionally, where money damages can provide a remedy, injunctive relief is not proper. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) ("Irreparable injury is one that cannot be redressed through a monetary award."); *see also Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) ("[w]here there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances"); *J&J Sports Prods., Inc. v. Vasquez*, No. 06-cv-335 (FB) (RER), 2006 WL 2583740, at *6 (E.D.N.Y. Sept. 7, 2006) (denying injunction because the "[p]laintiff has not submitted any evidence that it will suffer irreparable harm or that the plaintiff's legal remedy of statutory damages, attorney's fees and costs are insufficient," even though "an injunction is an available remedy pursuant to" the relevant statute. At oral argument, Bernardino's counsel conceded that there is no way of undoing the conveyance of the DVD purchase information. (Doc. No. 45

at 28:7-8.)  Thus, there is no relief available to Bernardino that cannot be obtained in the normal course of this litigation (or arbitration) and through money damages.  If Bernardino succeeds in providing a VPPA violation, Barnes & Noble necessarily will have to change its website, and Bernardino can recover up to $2,500 in statutory damages (or more if a jury values the harm from providing the DVD purchase information to Facebook's database at a higher amount).  For these reasons, Bernardino has failed to make a strong showing of irreparable harm.

Bernardino argues that she should be excused from having to prove irreparable harm because there is a clear statutory violation.  (*See* Pl.'s Mem. of L. pp. 4-5, 14.)  The cases on which Bernardino relies, however, are not applicable because they concern government plaintiffs, not private plaintiffs seeking mandatory injunctive relief.  In fact, Bernardino's cited cases expressly distinguish governmental from private plaintiffs.  *See City of N.Y. v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120-21 (2d Cir. 2010) (recognizing the "well-established rule that *agencies* need not prove irreparable injury . . . *as required in private litigation suits*") (internal quotation marks omitted and emphasis added); *United States v. Dispulse Corp. of Am.,* 457 F.2d 25, 27-28 (2d Cir. 1972) (holding that U.S. government did not have to prove irreparable injury and observing that "the function of a court in deciding whether to issue an injunction [in favor of the United States] . . . is a different one from that of the court when weighing claims of two private litigants"); *see also Verzani v. Costco Wholesale Corp.*, 387 F. App'x 50, 51-52 (2d Cir. 2010) (explaining that a *private* plaintiff suing under a state consumer

protection statute *must* prove irreparable harm).[3]  Moreover, as discussed below, it is not entirely clear whether Bernardino can prove a statutory violation.  Thus, Bernardino is incorrect that she is excused from proving irreparable harm.

Finally, Barnes & Noble argues that Bernardino delayed moving for injunctive relief, which prevents her from showing irreparable harm.  *See Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 442-43 (E.D.N.Y. 2013) ("a months-long delay before seeking an injunction suggests that a plaintiff does not believe she has a viable claim, but is merely seeking preliminary relief as a commercial strategy."); *Markowitz Jewelry Co. v. Chapal/Zenray, Inc.*, 988 F. Supp. 404, 407 (S.D.N.Y. 1997) (holding that plaintiff "bore the burden of coming forward with evidence to excuse its delay," denying preliminary injunction because plaintiff failed to meet that burden, and ruling that "[u]nsworn statements by counsel [in plaintiff's reply brief] simply will not do").  Bernardino does not state when she learned of the alleged violation of her privacy.  Her lawyer proffered at oral argument only that Bernardino learned of the alleged privacy violation in conversations with her counsel shortly before filing the Complaint.  (*See* Doc. No. 45 at 9:9-24; 10:11-24; 78:3-78:7.)  If this is true, she may be able to show there was no delay.  Alternatively, as a Facebook user, Bernardino may be deemed to have had constructive knowledge that her DVD purchase information would be collected and shared with Facebook by virtue of published Facebook and Barnes & Noble policies.  Both entities' policies, easily located on the internet, advise users about the use of cookies and transmission of data to partners and third-party providers, and state that users consent to their policies by using their

---

[3] To the extent Bernardino states that this case is similar to copyright cases where preliminary injunctions have been issued, she is mistaken.  In a copyright violation case, the plaintiff cannot avoid future harm as Bernardino can here.

websites and applications.  Bernardino also knew at the time of her purchase that she did not

click a separate consent button giving Barnes & Noble permission to share her DVD purchase

information.  Thus, it is possible that Bernardino did delay in filing for preliminary injunctive

relief.  In short, there is insufficient information for the Court to determine whether there was

delay.  However, Bernardino cannot show irreparable harm for the other reasons set forth

above, and, therefore, should not be entitled to preliminary injunctive relief.

    B.   *Likelihood of Success on the Merits*

Even if Bernardino could demonstrate irreparable harm, injunctive relief is also

inappropriate because she has not made a clear and substantial showing of likelihood of

success on the merits.  Here, the parties disputewhether Barnes & Noble knowingly conveyed

information that was "personally identifiable" within the meaning of the VPPA.

The VPPA was enacted after a newspaper published a long list of Supreme Court

nominee Robert Bork's video rentals.  (Compl. ¶ 57.)  Through its enactment, Congress sought

"to prevent disclosures of information that would, with little or no extra effort, permit an

ordinary recipient to identify a particular person's video-watching habits."  *In re Nickelodeon*

*Consumer Privacy Litig.*, 827 F.3d 262, 284 (3d Cir. 2016), *cert. denied sub nom., C.A.F. v.*

*Viacom, Inc.*, 137 S. Ct. 624 (2017).

The statute defines "personally identifiable information" as including information which

"identifies a person as having requested or obtained specific video materials or services from a

video tape service provider."  18 U.S.C. § 2710(a)(3).  The statute specifies the circumstances

when disclosure of personally identifiable information may and may not be disclosed.  18 U.S.C.

§ 2710(b).  Disclosure is permitted with informed, written consent of the consumer (which can

be through electronic means)[4] that must be in a "form distinct and separate from any form setting forth other legal or financial obligations of the consumer," among other requirements. 18 U.S.C. § 2710(b)(2)(B).  The VPPA also permits disclosure of the names and addresses of consumers as well as the subject matter of videos, if the disclosure is "for the exclusive use of marketing goods and services directly to the consumer," or if the disclosure is "incident to the ordinary course of business of the video tape service provider."  18 U.S.C. § 2710(b)(2)(D)-(E).

Bernardino argues that Facebook's "fr" cookie, a string of numbers and letters transmitted to Facebook,[5] is "personally identifiable information" within the meaning of the VPPA because when transmitted to Facebook, Facebook can match the DVD purchase information to a purchaser's unique Facebook ID (if the purchaser has a Facebook ID).  (Pl.'s Mem. of L. pp. 8-11; Pl.'s Reply pp. 5-6.)

Few courts have considered whether the type of information conveyed by Barnes & Noble is PII within the meaning of the VPPA.  Bernardino cites *In re Hulu Privacy Litig.*, No. 11-cv-3764 (LB), 2014 WL 1724344, at *13 (N.D. Cal. Apr. 28, 2014), among other cases, as recognizing that the Facebook "fr" cookie constitutes personally identifiable information as defined under the VPPA.  In *In re Hulu*, the court found that there was a triable issue of fact as to whether the Facebook ID was "personally identifiable information," but this ruling does not

---

[4] The statute was amended in 2011 to "clarify that a video tape service provider may be obtained through the Internet."  H.R. Rep. 112-312 (2011).  At the time the amendment passed, Congress was aware that internet companies like Facebook "track, retain, market and mine information on their customers," and the legislative history makes clear that the amendment was intended "to provide a seamless process to share video viewing habits on social media (like Facebook) in the same manner currently in use for music, books and news articles."  *Id.* Critics of the amendment objected to the loosening of the disclosure rules and objected to the amendment's "exclusive aim," which was "to provide a safe haven for wide-scale disclosures made possible by technological innovation."  *Id.*

[5] The string of letter and numbers is: "OglRJJKaszKOLdKz8.AWXGH1RrxSLM3PHeHxfrORv10H8.BCVchV.Sj.FUJ.0.Sj.FUJ.0.AWWsuv8a."

establish that Bernardino has a clear and substantial likelihood of success on the merits.

Bernardino's reliance on *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 484, 486 (1st Cir. 2016) is similarly unpersuasive because, there, the First Circuit addressed whether the disclosure of specific GPS coordinates constituted PII, which is more akin to an address than the type of code at issue here.

Other courts have recognized that there must be limitations to what constitutes PII under the VPPA. *See In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 383 ("We do not think that, when Congress passed the [VPPA], it intended for the law to cover factual circumstances far removed from those that motivated its passage."); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 181 (S.D.N.Y. 2015) (recognizing that there must be some principle limiting what information qualifies as PII because, "[i]f nearly any piece of information can, with enough a on behalf of the recipient, be combined with other information so as to identify a person, then the scope of PII would be limitless."). In *In re Nickelodeon*, the Third Circuit expressed skepticism about whether the definition of PII includes information that "to an average person . . . would likely be of little help in trying to identify an actual person." In Barnes & Noble's view, the Facebook "fr" cookie is the type of information that cannot be personally identifying citing *Nickelodeon*.

However, this Court's task on the present motion is not to decide the issue of whether the information conveyed is PII. Rather, it is merely determining whether Bernardino has made a clear and substantial showing of success on the merits. Given that there is no binding precedent to support Bernardino's broad interpretation of PII and, on the contrary, there is

case law to support Barnes & Noble's position that the alleged disclosure may not constitute PII, Bernardino has not made a clear and substantial showing of success on the merits.

Barnes & Noble also contests that it had knowledge of the conveyance of the information as contemplated by the VPPA. As noted above, Bernardino's case hinges on the transmission of certain information which, if combined with other information that Facebook has, would link Bernardino's unique Facebook ID to her DVD purchase. Recently, the court in *In re Hulu Privacy Litigation* addressed the knowledge element of a VPPA violation and found that mere knowledge of transmission of information was insufficient to prove a violation of the VPPA. 86 F. Supp. 3d 1090, 1095-97 (N.D. Cal. 2015). Rather, the court found that a plaintiff must prove that the defendant knew that a third party would actually link information it had with other information conveyed and become aware that a particular person had in fact purchased a particular video. *Id.* (granting motion for summary judgment because there was no evidence that Hulu knew that Facebook would link video information conveyed with user's Facebook IDs).

Bernardino argues that there is substantial proof that Barnes & Noble knew that Facebook would link the information, relying on Facebook's policies and Barnes & Noble policies. But the knowledge element of the VPPA violation is intertwined with the definition of PII. If Barnes & Noble did not think it was conveying PII, then there could be no knowledge of the conveyance, regardless of whether it knew what Facebook might do with the information. In short, far from what Bernardino argues, it is an open question as to whether Bernardino will prevail on the knowledge element of her VPPA claim. Bernardino certainly has not demonstrated a clear and substantial likelihood that she will prevail in proving that Barnes &

Noble "knowingly" made a disclosure of PII.  Thus, Bernardino's motion for a preliminary

injunction should also be denied because she has not demonstrated a clear and substantial

likelihood of prevailing on the merits or her claim.

    C.  *Balance of Equities*

        When deciding whether to issue a preliminary injunction, the Court must balance the

equities for and against the injunction.  The balance of equities further tips against issuing an

injunction here.  The mandatory injunction Bernardino seeks would effectively provide her with

the ultimate relief she seeks in this litigation, aside from monetary damages stemming from the

alleged harm at issue.  If Barnes & Noble is forced to expend the time and money to modify its

website now, with the attendant burdens and potential disruption to customer's shopping

experience, it is unlikely to modify its website and revert back to the current status quo.  In

contrast, there is no dispute that Bernardino can avoid future harm by purchasing DVDs

elsewhere, or simply watching DVDs online.  In these circumstances, there is no question that

equity requires denial of preliminary injunctive relief.  *Marcy Playground, Inc. v. Capital*

*Records, Inc.,* 6 F. Supp. 2d 277, 283 (S.D.N.Y. 1998) (denying preliminary injunction where

balance of hardships tipped in defendants' favor because "the erroneous issuance of a

preliminary injunction would interrupt the marketing of a hit recording that is generating very

substantial revenues"); *Capital Realty Inv'rs Tax Exempt Fund Ltd. P'ship. v. Dominium Tax*

*Exempt Fund L.L.P.*, 944 F. Supp. 250, 260 (S.D.N.Y. 1996) ("[T]he threat of irreparable injury to

plaintiffs is at most *de minimis*, and the balance of the equities . . . does not tip decidedly in

favor of the plaintiffs."); *Lite Factory, Inc. v. Catalina Lighting, Inc.*, No. 88-cv-840, 1989 WL

8181, at *2 (E.D.N.Y. Jan. 27, 1989) (denying preliminary injunction where "the balance of

hardship would tip in defendant's favor" because, "[i]f forced to stop production and sales then its reputation as a supplier of these products may be affected adversely"); *Sun Chem. Corp. v. Dainippon Ink & Chems., Inc.,* 635 F. Supp. 1417, 1423 (S.D.N.Y. 1986) (denying preliminary injunction because "the injury [plaintiff] asserts is. . . avoidable", and so "does not constitute irreparable harm or show a balance of hardships in [plaintiff's] favor"). Bernardino's arguments hinge on a finding that her rights were in fact violated—but such a finding is not a forgone conclusion for the reasons discussed above.

D. *Public Interest*

Barnes & Noble also argues that a preliminary injunction is improper because Bernardino has not shown that an injunction would be in the public interest. Instead, it argues, Bernardino's case amounts to a policy dispute and misguided attempt to stretch the VPPA's reach to data aggregation. Bernardino did not address this argument in her reply brief or at oral argument. Given that no human being ever learned the name of the DVD Bernardino purchased through any disclosure made by Barnes & Noble and that Bernardino herself did not even know her DVD purchase information was shared with Facebook until she was so advised by an expert, this Court agrees that this action concerns an effort to shape policy more than Bernardino's effort to remedy a breach of her privacy. For this reason as well, this Court finds that an injunction should not issue. *See W. Watersheds Project v. Salazar*, No. 11-cv-492 (DMG), 2011 WL 13124018, at *21 (C.D. Cal. Aug. 10, 2011) (holding that the public interest "tips sharply against an injunction" where plaintiff's dispute "amounts to a policy disagreement", and "[i]t is not this Court's role to substitute its own policy judgments for those of the legislature").

### III.     Injunction in Aid of Arbitration

The last argument raised by Barnes & Noble concerns the type of injunctive relief available to Bernardino.  Bernardino seeks a mandatory injunction—removal of "all computer code from Barnes & Noble's website, wherever used, that is designed to or could result in the disclosure to Facebook."  (Doc. No. 20.)  The availability of this relief turns on whether this action is subject to arbitration.  An injunction in aid of arbitration is designed solely to preserve the status quo.  *See Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 910 F.2d 1049, 1053-54 (2d Cir. 1990) (an injunction in aid of arbitration must be designed to preserve the meaningfulness of the arbitration); *Bhd. of Locomotive Eng'rs v. Mo.-Kan.-Tex. R.R. Co.,* 363 U.S. 528, 531-32, 534 (1960) (same).  Thus, if this case is subject to arbitration, mandatory injunctive relief is not available.

Whether this case is arbitrable will be determined by Judge Kaplan in connection with the motion to compel arbitration.  Therefore, it is premature to decide whether Bernardino may seek a mandatory injunction now.  At oral argument, Barnes & Noble conceded that its argument regarding injunctions in aid of arbitration should be addressed in conjunction with its motion to compel arbitration.  This Court respectfully recommends that the Court revisit this issue, to the extent appropriate, upon determination of the motion to compel arbitration.

### CONCLUSION

For all of the above reasons, this Court respectfully recommends that Bernardino's Motion for a Preliminary Injunction be DENIED.

Date:   August 11, 2017
        New York, New York

SO ORDERED.

*Katharine H. Parker*
_____
KATHARINE H. PARKER
United States Magistrate Judge

## NOTICE

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure (*i.e.,* until August 25, 2017). *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)).

If any party files written objections to this Report and Recommendation, the opposing party may respond to the objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Kaplan. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).